## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,          Case No. 17-cv-00136-RHK-FLN

        Plaintiff,

    vs.                                      **BRIEF AMICUS CURIAE OF THE
                                                    BANKERS ASSOCIATIONS
                                                    IN SUPPORT OF THE DEFENDANT**

KLEINBANK,

        Defendant.

---

The undersigned group of bankers associations (BAs)[1] is pleased to provide this brief in support of KleinBank and its Motion to Dismiss in Case No. 17-cv-136-RHK-FLN. The Minnesota Bankers Association is the lead *amicus*. It is joined by two national banking trade groups, as well as by forty (40) additional state bankers associations. All the participating BAs are listed in Appendix A. Collectively, the BAs represent the vast majority of our nation's banks, ranging from the largest to the smallest and operating in every state. This lawsuit could have a significant impact on KleinBank, but the BAs believe that the precedent this case sets could also have serious implications for the entire banking industry.

---

[1] The BAs have written and are filing this brief on behalf of their member banks. No counsel for any party to this case authored this brief in whole or in part, and neither a party nor its counsel, or any other party contributed money that was intended to fund preparing or submitting the brief.

KleinBank's Memorandum of Law in Support of its Motion to Dismiss has detailed its position in this case. We agree with KleinBank's conclusions. Rather than restating all the legal arguments and precedent included in that Memorandum, the BAs will use this brief to note the significant impact this lawsuit could have on the banking industry as a whole.

This lawsuit involves "redlining," a specific type of illegal discrimination. The BAs and our member banks do not condone redlining. There is no place in banking for that type of purposeful misconduct.

However, bankers need certainty with respect to how redlining is defined, and they need consistency as to how the federal agencies enforce this anti-discrimination rule. Bankers and attorneys with thorough knowledge of the fair lending laws, regulations and enforcement standards are shocked that the federal government filed this lawsuit with so little evidence. A Court ruling against KleinBank would mean a major change in the definition of redlining and a significant departure from long-standing evidentiary requirements, exposing all banks to new legal, regulatory and reputational risk.

## I.      Operating in a Heavily Regulated Industry, Bankers Need Certainty and Consistency

### A.      Bankers need certainty with respect to the banking laws and regulations

The banking industry is one of the most heavily-regulated industries. Banks are subject to tens of thousands of pages of complex, extremely detailed federal banking laws and regulations. Bank compliance staff must know and understand the requirements of the laws and regulations, which is a big challenge. The intricate details in the rules, like

key definitions, are extremely important. For example, this case involves redlining, which is a specifically-defined type of illegal discrimination. Bankers need certainty that all the federal agencies will acknowledge and use the same definition of redlining.

  B.  Bankers also need consistent enforcement of the laws and regulations

  Many industries must operate in compliance with rules and regulations. However, few industries are subject to the type of strict enforcement standards to which banks are held. The bank regulatory agencies enforce the banking laws and regulations through regularly scheduled, on-site bank examinations. In addition to knowing the requirements of the various banking laws and regulations, bank compliance officers must understand how regulators will enforce the rules.

  Fortunately, the bank regulatory agencies share their examination procedures with the bankers. For example, the Federal Deposit Insurance Corporation (FDIC) publishes a Compliance Examination Manual (CEM), which provides step-by-step enforcement guidance to its compliance examiners.[2] Because it contains such detailed guidance, bank compliance officers rely heavily on the CEM as an important resource when establishing their bank's compliance program and preparing for examinations.

  The first three chapters of the CEM provide bankers with helpful information about the compliance examination process itself. The "Overview of Compliance Examinations" section of the manual describes the FDIC's Examination Approach, the

---

[2] FDIC Compliance Examination Manual—March 2017. https://www.fdic.gov/regulations/compliance/manual/ KleinBank is regulated by the FDIC, so references to examination procedures will be to the FDIC's procedures.

Role of the Compliance Examiner and an Overview of the Examination Process.[3] In addition, the CEM includes substantive information. The remaining nine chapters of the manual contain detailed examination procedures for assessing compliance with over thirty different federal consumer protection statutes.[4] For example, Chapter IV of the CEM covers the Fair Lending Laws, while Chapter V covers Compliance Lending Issues and Chapter VI covers Compliance Depository Issues.[5]

Both the CEM's process-related information and substantive examination procedures help ensure the regulatory agencies conduct their bank examinations in a consistent manner, which is important to both the agencies and the banks. The banking regulatory agencies follow written, interagency examination procedures when determining whether a bank has engaged in redlining. Bankers need consistency with respect to enforcement of the rules. They need to know that all the federal agencies will follow the same redlining examination procedures and enforcement standards.

C.     Comments by former Department of Justice Civil Rights Division Director Gupta: "expansive reading of the law" and "creativity"

The New York Times recently published an article about the Department of Justice's (DOJ's) former Civil Rights Division Director, Vanita Gupta, who left her position in the final week of President Obama's administration.[6] The article noted several

---

[3] Id., pages II-1.1 - 1.4.
[4] Id., Chapters IV-XII.
[5] Id.
[6] New York Times, "Under Trump, Approach to Civil Rights Law is Likely to Change Definitively," by Matt Apuzzo, January 19, 2017.

specific areas in which the Civil Rights Division had been particularly active, and it highlighted the dedication and passion that Director Gupta brought to her position. In light of the KleinBank case, a couple statements in the article caught the bankers' attention. According to the article, Director Gupta said that ensuring civil rights "requires going to the more expansive reading of the law."[7] The article also stated Director Gupta said that the project of civil rights "has always demanded creativity."[8]

A federal law enforcement agency employing a "more expansive reading of the law" and exercising "creativity" is extremely troubling to a heavily-regulated industry that needs certainty and consistency.

## II.    Interagency Fair Lending Examination Procedures and Redlining

The Fair Housing Act (FHA) and the Equal Credit Opportunity Act (ECOA) both define and prohibit illegal discrimination.[9] The bank regulatory agencies, through the Federal Financial Institutions Examination Council (FFIEC), have written "Interagency Fair Lending Examination Procedures" (FL Procedures) to guide bank examiners when they conduct fair lending compliance examinations.[10] This 42-page document is based on the fair lending laws, their implementing regulations and applicable case law. The FL Procedures explain the requirements and enforcement standards for the various types of

---

https://www.nytimes.com/2017/01/19/us/politics/civil-rights-justice-department-donald-trump.html

[7] Id.

[8] Id.

[9] The Fair Housing Act, 42 USC 3601, et seq., and the Equal Credit Opportunity Act, 15 USC 1691, et seq. Together, the FHA and the ECOA are termed the "fair lending laws."

[10] Interagency Fair Lending Examination Procedures, August 2009. https://www.ffiec.gov/pdf/fairlend.pdf

illegal discrimination, including redlining. The FDIC has incorporated the FL Procedures

into its CEM, described earlier, and they update the procedures as needed.[11] FDIC

examiners follow the FL Procedures in the CEM during compliance examinations, which

helps ensure consistent enforcement with respect to this important area of law.[12]

 The regulatory agencies specifically encourage bankers to use the FL Procedures

as a resource, too.[13] Most bank compliance officers are not attorneys, so they may not be

able to cite every case interpreting the fair lending laws and regulations. However, they

gain a solid understanding of the fair lending rules and enforcement standards by

analyzing the agencies' available resource materials, including the FL Procedures.

 A. Redlining definition: a form of illegal disparate treatment discrimination

 The FL Procedures identify two different types of illegal discrimination, disparate

treatment and disparate impact.[14] The FL Procedures state:

> "Redlining is a form of illegal disparate treatment in which a lender
> provides unequal access to credit, or unequal terms of credit, because of the

---

[11] The FDIC included the FL Procedures in Chapter IV of its CEM.
https://www.fdic.gov/regulations/compliance/manual/4/iv-1.1.pdf.

[12] See, for example, the FDIC's Fair Lending Examination Procedures. "The FDIC has developed the Fair Lending Scope and Conclusions Memorandum (FLSC) to implement a standard nationwide format for documenting the scope and conclusions of fair lending reviews." Id., page IV-1.3.

[13] See, for example, the FDIC's presentation entitled "Fair Lending Hot Topics" dated November 16, 2010. Redlining was the first "Hot Topic" covered in that presentation. The fifth slide reads, "What Banks Should Do," and the first suggestion is "Review FFIEC Fair Lending Examination Procedures and Risk Indicators Related to Redlining." www.fdic.gov/news/conferences/fl/websitefinalfairlendinghottopics.ppt

[14] FDIC Compliance Examination Manual, page IV-1.2. A discussion of disparate impact discrimination is not relevant here because redlining is specifically defined as disparate treatment discrimination.

race, color, national origin, or other prohibited characteristics of the residents of the area in which the credit seeker resides or will reside."[15]

This definition of redlining is essentially the same as the definition in the Interagency Policy Statement on Discrimination in Lending (Policy Statement), which was issued by ten federal agencies, including the DOJ, and which remains in effect today.[16]

There are different types of disparate treatment discrimination, but they all have the same causation standard. They all involve different treatment *because of* a prohibited factor. The fact that two individuals receive different loan outcomes, alone, is not enough to prove disparate treatment discrimination. One applicant may be qualified for the loan while the other applicant is not qualified, which justifies the fact that they received different treatment. The Official Commentary to Regulation B, which implements the ECOA states, "Treating applicants differently on a prohibited basis is unlawful if the creditor lacks a legitimate nondiscriminatory reason for its action, or if the asserted reason is found to be a pretext for discrimination."[17]

Similarly, the fact that a bank is not serving a certain geographic area, alone, is not enough to prove redlining. A redlining claimant must meet the required causation standard by offering evidence that proves the bank treated two geographic areas differently because of the race or national origin of the people in those areas.

---

[15] FDIC Compliance Examination Manual, page IV-1.3. Redlining can occur based on any of the prohibited bases. In this case the DOJ has alleged redlining because of race and/or national origin, so this brief will use that terminology.

[16] See, Policy Statement on Discrimination in Lending, issued April 15, 1994. https://www.fdic.gov/regulations/laws/rules/5000-3860.html

[17] Supplement I to 12 CFR 1002, Official Interpretations, § 1002.4 (a), ¶ 2. (ii).

B.      Specific evidence needed to prove redlining

The FL Procedures state that there are two forms of evidence a claimant can use to prove redlining: "Like other forms of disparate treatment, redlining can be proven by overt or comparative evidence."[18] Overt evidence would include an explicit written or verbal policy or statement that the bank links the racial or national origin character of an area with any aspect of access to, or terms of, credit.[19] According to the FL Procedures, "Overt evidence is relatively uncommon. Consequently, the redlining analysis usually will focus on comparative evidence, (similar to analyses of possible disparate treatment of individual consumers)."[20]

The comparative evidence method proves redlining by default. A bank may treat geographic areas differently if it has a legitimate nondiscriminatory business reason for doing so. However, if the bank does not have a legitimate nondiscriminatory business reason for treating two geographic areas differently, illegal discrimination is deemed to be the cause, by default. Arriving at that conclusion requires a detailed analysis.

In four pages of text, the FL Procedures describe the Six Steps, with multiple sub-steps, examiners follow when conducting a comparative evidence analysis for redlining.[21] The examiners closely scrutinize the demographic and economic characteristics of the areas the bank serves and the areas it does not serve.[22] After analyzing the required

---

[18] Id., page IV-1.19.
[19] Id.
[20] Id.
[21] Id., pages IV-1.20 - 1.23. The FDIC CEM is single-spaced and uses a 9-point font. The four pages of text describing the six steps are quite detailed.
[22] Id., pages IV-1.20 - 1.21.

information, the examiners determine, based on the totality of the circumstances, whether there is a difference in treatment between certain geographic areas that has not yet been fully explained by the bank.[23] If so, the examiners obtain the bank's explanations for the apparent difference in treatment and evaluate whether the explanations are credible and reasonable.[24]

At that point the examiners may determine that the bank has provided a credible, legitimate nondiscriminatory explanation, which ends the comparative evidence analysis. Alternatively, if the examiners determine the bank's explanations are not adequate, they continue to the final step: The FL Procedures require that examiners obtain and evaluate additional information that may support or contradict the interpretation that the difference in treatment constituted a finding of redlining.[25] The regulators consider information about other competitors serving the areas in question, gather input from community leaders and review any other information the bank deems relevant.[26]

This in-depth analysis is necessary to prove that the bank acted because of the race and/or national origin of the people in the areas in question, by eliminating the possibility that the bank had a legitimate, nondiscriminatory business reason for its decisions.

## III.    The DOJ's Redlining Complaint Against KleinBank

This lawsuit has caused significant concern for the banking industry because the DOJ complaint does not use the redlining definition that is in the FL Procedures and the

---

[23] Id.
[24] Id., page IV-1.21 - 1.22.
[25] Id., page IV-1.22 - 1.23.
[26] Id.

Policy Statement. Instead, it suggests a new definition. Also, the DOJ complaint does not seem to follow the redlining evidentiary standards that are in the FL Procedures.

The complaint states that KleinBank has excluded a number of majority-minority areas from its assessment area.[27] While that statement is true, in order to prove that KleinBank engaged in redlining, the DOJ must do much more than note the existence of majority-minority areas located outside the bank's assessment area. The DOJ must prove that KleinBank's decision to exclude specific geographic areas from its assessment area was *because of* the race and/or national origin of the people in those areas, by offering either overt evidence or comparative evidence of disparate treatment.

A.     The complaint's expansive definition of "redlining"

As noted above, the FL Procedures and the Policy Statement define redlining as a form of disparate treatment, and the definition includes a causation standard. The claimant in a redlining case must prove that the defendant acted *because of* the race or national origin of the people in the areas in question. The DOJ complaint suggests a different definition of redlining: "'Redlining' is the practice by which lenders deny or avoid providing credit services to predominantly minority neighborhoods."[28] This proposed definition of redlining does not include a causation standard.

The DOJ asks the Court to disregard the current definition of redlining included in the FL Procedures, a definition which is based on the fair lending laws, regulations and years of case law and which is used by the bank regulatory agencies and relied upon by

---

[27] Complaint, ¶ 20.
[28] Complaint, ¶ 2.

bank compliance officers. The DOJ also asks the Court to ignore the definition of redlining in the Policy Statement, even though the DOJ was one of the agencies that issued that guidance document. Instead, the DOJ would have the Court adopt a new, expansive definition of redlining.

> B.     No evidence of overt discrimination in the complaint

The complaint against KleinBank draws sweeping conclusions, but the DOJ offers virtually no evidence. For example, the complaint states, "KleinBank's discriminatory practices described herein have been intentional and willful, and implemented with reckless regard for the rights of individuals on the basis of race and/or national origin."[29] The DOJ offers no evidence to back up those conclusions. Specifically, the complaint includes no overt evidence that the bank's owners, managers or employees made explicit written or verbal statements that KleinBank did not want to serve certain geographic areas because of the race and/or national origin of the people living in those areas.

> C.     No indication that the DOJ conducted a comparative evidence investigation

With no evidence of overt discrimination, the DOJ has just one court-approved option for proving redlining: the DOJ can offer comparative evidence of disparate treatment. The complaint gives no indication that the DOJ conducted a full comparative evidence review. The DOJ offers no evidence that it considered all the economic and demographic characteristics of the areas KleinBank serves and the areas it does not serve. One sentence declares, "KleinBank's proper CRA assessment area would include the

---

[29] Complaint, ¶ 37.

entirety of Hennepin and Ramsey Counties."[30] However, the complaint offers no facts to support how the DOJ made that determination and no facts to show that this community bank has the ability and the capacity to serve this significantly expanded territory.

The comparative evidence method proves illegal discrimination by default. The claimant proves discrimination by eliminating every possibility that the bank took action based on a legitimate, nondiscriminatory business reason. The complaint does not suggest that the bank had an opportunity to provide the legitimate business reasons for how it determined its current assessment area. If the bank provided some reasons for its decision, the complaint does not state why the DOJ rejected the bank's reasons or how the DOJ determined, based on the totality of the circumstances, that none of the reasons were considered credible or reasonable.

The complaint also does not suggest that the DOJ followed the final step in the FL Procedures, obtaining and evaluating additional information that might support or contradict a finding of redlining. That additional information certainly should have included a thorough analysis of how the FDIC, the bank's primary regulator, determined that KleinBank had not engaged in any illegal discrimination,[31] while the DOJ reached the opposite conclusion, namely that the bank engaged in redlining.

---

[30] Complaint, ¶ 21.

[31] See, for example, the Public Disclosure portion of KleinBank's most recent Community Reinvestment Act Evaluation, dated November 19, 2015. Page 14 of this publicly available FDIC report specifically states, "Examiners did not identify any evidence of discriminatory or other illegal credit practices." https://www5.fdic.gov/crapes/2015/01414_151119.PDF

Consistent with the plain language of the fair lending laws and regulations as well as years of discrimination-related court decisions, the FL Procedures provide a specific definition of redlining. The FL Procedures require that a claimant in a redlining case must meet a causation standard, proving that the bank took action because of the race or national origin of the people in the affected areas. In this complaint the DOJ suggests a new definition of redlining that eliminates the causation standard, as if Congress had established a strict liability standard in the fair lending laws. Congress did not, so we urge the Court to reject the DOJ's new definition.

Also, the FL Procedures include a detailed description of the court-approved evidentiary standards needed to prove redlining. The DOJ has failed to allege either of the two types of evidence required to prove that KleinBank set its trade area because of the race and/or national origin of the people in the affected geographic areas. Therefore, we urge the Court to grant KleinBank's Motion to Dismiss.

If the Court were to find in favor of the DOJ in this case, the current definition of redlining and the evidentiary standards needed to prove this type of discrimination would both be eliminated. Instead, a new expansive definition of redlining, and a new, significantly relaxed evidentiary standard would be created. Under those new standards, the mere existence of a majority-minority neighborhood located outside a bank's assessment area would automatically equate to redlining. A bank would have no opportunity to provide a legitimate nondiscriminatory business reason explaining how it determined its trade area. In fact, a bank could have five, or even ten, perfectly legitimate, nondiscriminatory business reasons for how it determined its trade area, and it could still

be found guilty of redlining. Changing the redlining definition and evidentiary standards in that manner would immediately subject banks all across the country to new legal, regulatory and reputational risk. That situation simply cannot stand.

## CONCLUSION

For all the forgoing reasons, the BAs supporting this brief urge the Court to grant KleinBank's Motion to Dismiss.


Dated:  June 5, 2017                    Respectfully submitted,

                                        THE BANKERS ASSOCIATIONS

                                        By: /s/ Joseph J. Witt

                                        Joseph J. Witt (Mn. Bar No. 024174X)
                                        MINNESOTA BANKERS ASSOCIATION
                                        8050 Washington Ave South, Suite 150
                                        Eden Prairie, MN 55344
                                        Telephone:  952.835.3900

                                        Attorney for *Amicus Curiae* the Bankers
                                        Associations

### Appendix A-Bankers Associations Supporting this Brief

The Minnesota Bankers Association is the lead *amicus*. A significant number of

banking trade groups from across the country are keenly interested in this case, and they

support this brief. The American Bankers Association (ABA) joins the lead *amicus*.

> The ABA is the principal national trade association of the financial services
> industry in the United States. Founded in 1875, the ABA is the voice for the
> nation's $13 trillion banking industry and its more than one million
> employees. ABA members are located in all fifty States and Washington, D.C. and
> include large and small financial institutions. The ABA's members hold a
> substantial majority of the U.S. banking industry's domestic assets and are leaders
> in all forms of consumer financial services.

The Independent Community Bankers of America (ICBA) also joins the lead *amicus*.

> The ICBA, a national trade association, is the nation's voice for more than 5,800
> community banks of all sizes and charter types.  ICBA member community banks
> seek to improve cities and towns by using local dollars to fund loans for
> consumers, families and small businesses.

In addition to those national trade groups, the following forty (40) state bankers

associations join the lead *amicus*, as well.

> Alabama Bankers Association, Alaska Bankers Association, Arizona Bankers
> Association, Arkansas Bankers Association, California Bankers Association,
> Colorado Bankers Association, Florida Bankers Association, Hawaii Bankers
> Association, Illinois Bankers Association, Independent Community Bankers of
> Minnesota, Indiana Bankers Association, Iowa Bankers Association, Kansas
> Bankers Association, Kentucky Bankers Association, Louisiana Bankers
> Association, Maine Bankers Association, Maryland Bankers Association,
> Michigan Bankers Association, Mississippi Bankers Association, Missouri
> Bankers Association, Montana Bankers Association, Nebraska Bankers
> Association, Nevada Bankers Association, New Jersey Bankers Association,
> New York Bankers Association, North Carolina Bankers Association,
> North Dakota Bankers Association, Ohio Bankers League, Oklahoma Bankers
> Association, Pennsylvania Bankers Association, South Carolina Bankers
> Association, South Dakota Bankers Association, Tennessee Bankers Association

Texas Bankers Association, Utah Bankers Association, Vermont Bankers Association, Virginia Bankers Association, West Virginia Bankers Association, Wisconsin Bankers Association, Wyoming Bankers Association