```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      The United States of America,   )  File No. 17-cv-136
 4                                    )           (PAM/FLN)
              Plaintiff,              )
 5                                    )
      v.                              )
 6                                    )  Courtroom 9W
      KleinBank,                      )  Minneapolis, Minnesota
 7                                    )  September 22, 2017
              Defendant.              )  9:34 a.m.
 8                                    )
      ------------------------------------------------------------
 9
                BEFORE THE HONORABLE FRANKLIN L. NOEL
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTIONS HEARING)
11
      APPEARANCES
12     For the Plaintiff:        U.S. DEPARTMENT OF JUSTICE
                                 CIVIL RIGHTS DIVISION
13                               BY:  CHRISTOPHER BELEN, AUSA
                                      ERNESTINE WARD, AUSA,
14                               950 Pennsylvania Avenue NW
                                 Northwestern Building, 7th Floor
15                               Washington, D.C. 20530

16     For the Defendant:        FREDRIKSON & BYRON, P.A.
                                 BY:  JOHN W. LUNDQUIST, ESQ.
17                                    ANUPAMA D. SREEKANTH, ESQ.
                                 200 South Sixth Street, #4000
18                               Minneapolis, Minnesota 55402

19     Amici curiae for The      MINNESOTA BANKERS ASSOCIATION
       Bankers Associations:     BY:  JOSEPH WITT, ESQ.
20                               Suite 150
                                 8050 Washington Avenue South
21                               Eden Prairie, Minnesota 55344

22     Court Reporter:           RENEE A. ROGGE, RMR-CRR
                                 1005 United States Courthouse
23                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
24
           Proceedings recorded by mechanical stenography;
25     transcript produced by computer.
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4          THE COURT:  Good morning.  Please be seated.

5          Okay.  This is *The United States versus KleinBank*.

6    Let's get everybody's appearance on the record.

7          For the government.

8          MR. BELEN:  Good morning, Your Honor.  Christopher

9    Belen on behalf of the United States, and Ernestine Ward is

10   also here from the Department of Justice.

11         THE COURT:  Welcome.

12         MR. LUNDQUIST:  Good morning, Your Honor.  John

13   Lundquist and Anu Sreekanth for the defendant KleinBank.

14         And I would like to also introduce -- well, Joseph

15   Witt is here for the amicus.

16         I was going to actually introduce Doug Hile, who

17   is the CEO of KleinBank, and Stephen Spears, senior

18   vice-president in charge of mortgage lending, among other

19   matters.

20         THE COURT:  Okay.  Mr. Witt.

21         MR. WITT:  Joseph Witt on behalf of the amicus

22   group.

23         THE COURT:  Okay.  So we are here for a hearing on

24   the defendant's motion to dismiss, correct?

25         MR. LUNDQUIST:  That's right.

1          THE COURT:  Mr. Lundquist.

2          MR. LUNDQUIST:  Thank you, judge.

3          So I'll start with a little background about

4    KleinBank.  KleinBank is an independent community bank.

5    It's based in Chaska, Minnesota.  It has served that part of

6    the community, the western part of the metro area, for over

7    a hundred years.  It has focused that entire time, all the

8    way up through the present, on smaller markets, suburban and

9    rural markets.  That's been its business strategy.  It's

10   family-owned by the Klein family.  It's the fourth

11   generation, I believe, currently.  And I know from speaking

12   with family members that they take this matter extremely

13   seriously and very personally.

14         The bank has a good reputation in the community.

15   They have a good reputation with their regulators.  They

16   have never been cited for any redlining or discriminatory

17   lending practices by FDIC or anyone else in their entire

18   history.  The complaint, of course, alleges exactly that,

19   violating fair lending laws, basically the Equal Credit

20   Opportunity Act, Fair Housing Act and specifically

21   redlining.

22         So redlining, as the court knows, is when a lender

23   provides either unequal access to credit or unequal terms of

24   credit specifically because of race, national origin or

25   other prohibited characteristics.

1          Generally, there are two ways of proving fair

2     lending violations, disparate impact, which is essentially

3     looking at a racially-neutral policy or conduct that has a

4     disproportionate negative impact on minorities.  Disparate

5     treatment, on the other hand, is all about purposefully

6     engaging in discriminatory lending.  The complaint in this

7     case did not identify which theory the government was

8     proceeding under.  The allegations, frankly, sound more in

9     disparate impact, but there is a conclusion that the bank

10    acted willfully, so it was -- that's why we covered both

11    theories in our opening brief.  And, of course, the

12    government now has disclaimed any reliance on disparate

13    impact.  And so we are only dealing with, and, of course,

14    that's what I am going to talk about this morning, the

15    disparate treatment theory, which obviously has a much

16    higher bar in terms of both pleading and proof.

17          And so it's interesting in this case, which

18    requires factual allegations of racially-motivated conduct,

19    that there is no allegation of any borrower ever being

20    denied credit.  There's no allegation of any borrower,

21    minority borrower, getting unequal or disparate terms of

22    credit.  There is no allegation of predatory lending.

23    There's not even any borrower identified.  In fact, there is

24    simply no discriminatory conduct by KleinBank alleged in the

25    complaint.  And there is a reason for that, and the reason

1        is that never happened.

2                So let's look at what the complaint actually does

3        allege, and there's essentially four categories.  And I'll

4        circle back and talk about each one of them, but

5        overview-wise the first and foremost allegation is that

6        KleinBank had a, quote, discriminatory CRA assessment area;

7        second, that no branches of the bank were located in

8        majority-minority census tracks, and I'll talk a little bit

9        more about what that means; third, that marketing was

10       featured within a radius of the branches; and, lastly, that

11       the government's analysis of data available through HMDA --

12       it's a statute, Home Mortgage Data Act, and so there is

13       publicly-available data called HMDA data on mortgage

14       applications and originations.  They looked at this and

15       concluded that KleinBank had fewer minority -- well, no, I'm

16       going to take that back -- fewer applications and origins in

17       certain geographic areas that would be in the expanded

18       assessment areas, they call it, that would include

19       Minneapolis and all of Ramsey County.

20               Our view, judge, is that these are classic

21       disparate-impact type allegations, they are racially neutral

22       on their face, and that they fail in this case because it's

23       a disparate treatment theory, and you need factual

24       allegations from which a plausible inference can be drawn

25       that the bank acted out of racial considerations in making

1   lending decisions.

2           The *Gallagher against Magner* case, Eighth Circuit

3   case from a few years ago, I think kind of illustrates the

4   difference between the two theories and the high bar that's

5   required.  In that case, of course, both the district court

6   and the Eighth Circuit said the allegations are not enough

7   for disparate treatment, even though there were allegations

8   in a very long complaint about certain groups being

9   overwhelmingly minority that were being marginalized and

10  certain comments by certain city officials that would have

11  supported, arguably, an inference of racial animus.  So that

12  case went off only on disparate impact.

13          So let's talk about the four areas.  Assessment

14  area.  Maybe just a brief word about the legal basis for

15  this.  The Community Reinvestment Act, that's the CRA,

16  requires banks to identify their marketplace and that

17  becomes their assessment area.  And it's important because

18  that has to reflect reality, because once you designate an

19  assessment area the FDIC is going to evaluate your

20  performance every time it comes out for an exam in that area

21  and, specifically, they are going to look at, among other

22  things, whether you are serving the credit needs of all of

23  the constituents in that area, and it cannot be

24  discriminatory.  That's right in the exam protocol, and we

25  cite this in the brief.  It's R.9.

1          So how did KleinBank draw its assessment area?

2     And I'm going to step back a few years.  Klein Financial is

3     a holding company, a family-owned holding company, which

4     owned roughly nine charters prior to 2005, nine bank

5     charters.  In 2005 those were merged.  Each had its separate

6     assessment area, but they were all combined in 2005 to

7     create the current assessment area, with certain tweaks.

8     There were a few tweaks made in -- could you put that up?

9     There were a few tweaks made in 2007, but it was mainly just

10     to fill in some gaps and some holes.

11          Could you pass that up to the judge?

12          THE CLERK:  Sure.

13          MR. LUNDQUIST:  Government, you have copies of

14     this.

15          MR. BELEN:  Yeah, Your Honor.  For the record,

16     they gave us copies five minutes before the hearing, so I do

17     have a copy to look at.

18          THE COURT:  Okay.

19          MR. LUNDQUIST:  We discussed these very maps for

20     two years.

21          So, essentially, you have the headquarters back

22     here in Chaska in Carver County.  The dots here reflect the

23     branch offices of KleinBank.  And you can see that -- and

24     let me further explain that the assessment areas in the

25     bright colors, the light colors for the City of Minneapolis

1    and Ramsey County are not included.  All right?

2         And then we also have from the 2010 census, which

3    is the basis for the numbers in the government's complaint

4    and their theory, we have color-coded the census tracks by

5    minority concentration with these colors indicated in the

6    upper right-hand corner.

7         Significantly, you can see that all of KleinBank's

8    branch offices are in the west.  They are all west of

9    Minneapolis.  The furthest east you go is probably Savage,

10   down here on the bottom.  Savage, of course, is in Scott

11   County, but it's right on the border of Dakota County.  And

12   so KleinBank included in its assessment area all of Dakota

13   County, even though the coverage is only from Savage.  And

14   the reason for that is there's a presumption when you have a

15   low population area to include whole geographic areas, such

16   as Dakota County, and so that's what they did here.

17        Similarly, in Anoka County, the eastern-most

18   office is in Coon Rapids, which is directly north of the

19   westerly border of Minneapolis.  Nevertheless, all of Anoka

20   County was included, because it's a relatively low

21   population area.  All right?

22        And then we have a business office down here in

23   Edina, a business lending office, that is essentially south

24   of the westerly border of Minneapolis.

25        So you can see that the C that the government

1    points to really is only because they included Anoka and

2    Dakota County in the assessment area, even though all of

3    their offices are in the west metro area.

4           KleinBank obviously has a long history of

5    operating in those markets.  They are all in the west, and

6    they are all relatively small markets.  That is KleinBank's

7    niche and always has been.  That is the business reason why

8    these locations are where they are, it's the business reason

9    why the assessment area is what it is, and it's race

10   neutral.

11          But even without being in Minneapolis or Ramsey

12   County, KleinBank has substantial coverage of

13   majority-minority census tracks.  KleinBank covers 19 of the

14   58 majority-minority census tracks in Hennepin County.

15   That's over 30 percent.  Even without being in Minneapolis.

16   And you can see there's a cluster up here next to the Maple

17   Grove office and there are several down here near the

18   business office in Richfield.  You don't need to be in

19   Minneapolis to serve minority communities.

20          This line that we are talking about, the so-called

21   redlining, the line that draws the assessment area for

22   KleinBank, is around a political subdivision, that is, the

23   City of Minneapolis.  That's what's excluded.  It's drawn

24   pursuant to the law.  And that's in paragraph 17 of the

25   complaint that it talks about lines being drawn to reflect

1     political subdivisions, particularly when they are large

2     metro areas.  KleinBank's strategy has never been to enter

3     into Minneapolis or St. Paul.  Nevertheless, the line is not

4     drawn around these other areas, which it could be; and if it

5     were, I would submit the government might have a credible

6     claim of redlining, but it's around the political boundary,

7     which is totally legit.

8           And, by the way, when I say 19 out of 58, you

9     don't have to take my word for it.  That's in paragraph 20

10    of the complaint.

11          So this reflects, this assessment area, a

12    race-neutral decision consistent with KleinBank's

13    decades-long history of serving small markets, primarily in

14    the west.

15          There's another reason, dealing with this

16    assessment area still, why the government's argument fails,

17    and that is excluding all of Minneapolis and St. Paul cannot

18    possibly constitute redlining, and that is because both of

19    those cities, or you can look at it either as the City of

20    St. Paul or all of Ramsey County and Minneapolis, however

21    you want to slice it, those areas are all majority-majority

22    areas.  So it is literally impossible to have any kind of

23    disparate treatment.  And we cite the census information in

24    footnote 6 of our brief for this.

25          So basically disparate treatment, disproportionate

1    treatment is impossible, because it's a majority-majority

2    area that the government is complaining about, rather than

3    focusing on certain neighborhoods that they think we should

4    be in.  They say we should be in that entire huge area.

5           So if anyone is disadvantaged in the City of

6    Minneapolis by having to drive out to Chaska to get a loan

7    at KleinBank, it's most likely going to be a Swede or

8    another member of the Caucasian majority, which are not

9    obviously a protected class.

10           But I'm not going to stop there, because at the

11   same time anybody who applies for a loan, and they often do

12   this on the internet from Wisconsin and eastern locations,

13   will not be turned away if they are from Minneapolis.  And

14   the proof of that is in Exhibit B to the complaint, where

15   they have got all the dots showing where the applications

16   come from.  There's no showing that there ever was any kind

17   of refusal based on the geography.

18           So on the assessment area our position is it's

19   simply not plausible to take a race-neutral map, such as

20   this, and draw a plausible conclusion that KleinBank had

21   racial animus when it located itself the way it did.  It

22   just doesn't fly.

23           The branch locations is the second area, judge.

24   We already discussed where the branches are and why.  They

25   are all west of Minneapolis.  They are small markets, which

1    is exactly where you would expect to see a community bank.

2    There's no legal requirement that has been cited and

3    certainly none that we're aware of that requires a bank to

4    locate itself in a large metro area just because it's in the

5    suburbs around it.

6          There is a big qualification to what I just said,

7    though, and that is this:  Whenever a bank that's under the

8    control or the regulation or supervision of FDIC opens or

9    closes a branch, they have to get permission from FDIC to do

10   so.  And so every time one of these branches open, FDIC had

11   to weigh in and say it was okay, it would be consistent with

12   the law, consistent with safe and sound business practices

13   and in accord, of course, with their business plan.

14         So, again, nothing in these race-neutral locations

15   is discriminatory.  All the constituents are well-served.

16   No one has ever claimed the contrary.  In fact, the Maple

17   Grove location is about three miles from a very heavy

18   majority-minority area of suburban Minneapolis.  The

19   business office, as I pointed out, is adjacent to a

20   majority-minority area.  So just on the face of the

21   complaint, and the complaint references the same locations,

22   it doesn't fly.

23         So as we argued in our opening brief, we don't

24   believe these allegations suffice under a disparate impact

25   theory.  They certainly don't even come close for disparate

1    treatment.

2          Marketing, the third topic.  Again, no plausible

3    inference can be drawn that marketing decisions were

4    race-based.  You know, there's two things that the complaint

5    says, judge.  One is that the bank failed to, quote,

6    unquote, "meaningfully market in majority-minority tracks."

7    Well, put aside the fact that most of the advertising is

8    electronic and it covers everything.  This allegation

9    doesn't provide notice of anything.  Presumably, if they say

10   it is not meaningful, they mean we have done some, but not

11   enough in their view, that simply doesn't rise to the level

12   of plausibility.

13          The other allegation is that marketing is alleged

14   to be around a radius of each branch.  Of course, it is.

15   That's how you would advertise.  If a branch is going to

16   advertise, it is going to pitch its geographic area.  So it

17   doesn't add anything to what we have already discussed about

18   branches.  Those are business decisions.  There's no

19   evidence, other than pure speculation, that race had any

20   basis in these decisions.

21          Lastly is the government's discussion of data,

22   which is a classic area for disparate impact and not

23   treatment unless, as we point out, the disparity is so stark

24   that it is overwhelming, like in the *Arlington Heights* case

25   where there was a 99 percent discordance or the *Yick Wo* case

1    where it was 100 percent denials.  There you could draw an

2    inference.

3            But there's lots of problems with the government's

4    numbers.  First, we need to recognize that these numbers do

5    not even reflect minority applications and minority

6    originations.  They only reflect neighborhoods.  And the

7    neighborhoods that they are looking at are 50 percent or

8    more minority.  So there's a 50/50 chance that it could be a

9    majority borrower in those neighbors, which could skew the

10   data any number of ways.

11           Of course, KleinBank's numbers are going to be

12   lower when you include areas that they have never been in.

13   The same would be true if you looked at Wisconsin.  We're

14   going to have different numbers, because they don't operate

15   in those geographic areas.

16           But the interesting thing is even if you do credit

17   the government's numbers and also conclude that KleinBank

18   had some heretofore unknown duty to penetrate all of

19   Minneapolis and St. Paul, we could still match the alleged

20   peers, the undisclosed peers that operate in these areas,

21   with only 29 more originations a year, a low number in the

22   overall scheme of things, and without even opening up a

23   branch in that area.  So the numbers are such that it's not

24   plausible to draw a racial motive.  It just doesn't -- they

25   are not compelling.

1          And I can see your brow was furrowed slightly.

2     The analysis of the 29 is in our brief, so I won't bore

3     everybody with trying to calculate that.

4          The other thing that's interesting is that there's

5     not a complaint or an allegation about a single denial from

6     these areas.  And let's talk about denials for a second.  If

7     we, again, look at the numbers in the complaint, and the map

8     is in the brief, KleinBank has a better batting average than

9     the alleged peers.  And what I am talking about is the ratio

10    of taking minority applications and converting them into

11    originations, in other words, funding the loan.  So

12    KleinBank has an 82 percent minority track, actually, not

13    minority borrower, conversion rate, taking these

14    applications and actually funding them, versus the peers who

15    operate in these areas at 75 percent.  That is totally

16    inconsistent with any kind of racial animus.  It just makes

17    no sense.

18         Lastly, let me just briefly say a few words about

19    the FDIC exam reports.  And the first thing I want to say is

20    that these are relevant --

21         THE COURT:  Before you do --

22         MR. LUNDQUIST:  Yeah.

23         THE COURT:  -- let me ask this, which is, On a

24    12(b)(6) motion can I even consider that?

25         MR. LUNDQUIST:  Absolutely.

1          THE COURT:  Because?

2          MR. LUNDQUIST:  Because the government has made an

3    allegation that when KleinBank has been examined over the

4    years no redlining exam was made.  That is wrong.  And I'll

5    talk -- I'll talk about the why it's wrong in a minute.  But

6    they make a statement about the exams, which opens up the

7    exams.  It's like they are incorporated by reference.  And

8    we are showing that that allegation is flat-out wrong.

9          THE COURT:  Okay.

10          MR. LUNDQUIST:  But here's the first point.  These

11    exam reports are not just relevant for the due process

12    argument.  They are extremely relevant for the plausibility

13    analysis.  And the reason why I say that is it is not

14    plausible that you would have XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX only to have the

20    government take that same data -- nothing is hidden here.

21    It's not like you got some informant saying here is what the

22    real skinny is.  This is all out there in the public domain.

23    It is not plausible that they can come in and say that the

24    FDIC has been wrong all of these years.

25          So here are the facts.  And I'm going to be

1    somewhat elliptical and high level, because I have learned

2    in this case that the FDIC takes this confidentiality issue

3    really seriously, so I don't want to violate that.  We all

4    know the FDIC regularly examines banks, including KleinBank.

5    I don't think anybody has an issue with that.  And they do

6    so by following very well-established written protocols that

7    we cited in our brief.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXX  It's the same information, once again, that the

17   department is talking about.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXX  So when they say there is no redlining

21   exam, it's extremely misleading, XXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  And as

23   the court is aware, you need the FDIC's blessing to continue

24   to operate your bank.  They can close you down if you don't

25   comply with the law and if you don't operate in a safe and

1    sound fashion.

2            On the other hand, when they come out and issue an

3    exam report and the whole board of directors looks at that

4    every time, they have to sign off on it, you are allowed to

5    continue to operate.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXX

11           So the bank, of course, continued on the same path

12   it had been on for years and continued to have that

13   assessment area, continued to have these branches.  There's

14   some tweaks that are made over the years.  They continued to

15   do everything that they always did to comply with fair

16   lending law, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18           Our claim, size of plausibility claim, is that it

19   violates due process to go back in time and say that the

20   FDIC's guidance to the bank was in error and we're going to

21   punish you for relying on that guidance.  It would be one

22   thing to say going forward you need to be in Minneapolis.

23   Okay.  We can talk about that.  But to go back in time, have

24   this court adjudicate violations of law, impose civil money

25   penalties, is punishment for doing something XXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3              It's particularly offensive I think when there is

4    no law, no regs giving notice that you have to be in a major

5    metropolitan area when you have operated in the western

6    suburbs for decades.  No one has ever said that to the bank,

7    not in the law, not in the FDIC.  So you can call it

8    estoppel.  You can call it retroactivity.  You can call it

9    lack of notice.  It's all the same.  It's a violation of due

10   process to punish someone for doing what the government told

11   to do.

12             And we cited *Cox*, a venerable Supreme Court case,

13   where a police officer said to a protester, "You can be

14   here.  That's fine," and then someone else comes by and

15   says, "You can't be here, and I'm going to arrest you for

16   being here."  That doesn't fly.  It's not the way this

17   country works.

18             And a little closer to home, we have got the

19   *Consumer Finance Protection Board* case that was vacated, the

20   D.C. case, on other grounds, but they have got a great quote

21   that we put in our brief about changing the rules

22   retroactively.  It's not fair, and it's not the way our

23   country runs.

24             So, in conclusion, Your Honor, the four areas that

25   the government talks about in the complaint are race

1  neutral.  There's no plausible inference that can be drawn

2  that these guys acted to discriminate against minority

3  borrowers.  And due process would be offended if the

4  government was allowed to go back in time and change the

5  rules of the game.

6          So unless the court has any questions, I will sit

7  down.

8          THE COURT:  Okay.

9          MR. LUNDQUIST:  Thank you.

10         THE COURT:  Thank you.

11         Mr. Witt, did you have anything you wanted to add?

12         MR. WITT:  Yes.  Thank you, Your Honor.

13         May it please the court.  I am Joseph Witt,

14 President and CEO of The Minnesota Bankers Association and

15 lead attorney for amici curiae, the Bankers Associations.

16         This group of associations is noteworthy.  We

17 assembled 41 state-based banking trade groups, plus the two

18 largest national banking trade groups, the American Bankers

19 Association and the Independent Community Bankers of

20 America.  Collectively, we represent over 95 percent of our

21 nation's banks.  This large group of associations is a

22 testament to the fact that this lawsuit has caused great

23 concern for the banking industry.  I want to thank the court

24 for allowing us to both participate in this case and make

25 some comments today.

1          The banking industry is heavily regulated, subject

2    to thousands of pages of laws and regulations.  All those

3    laws and regulations are actively enforced by the bank

4    regulatory agencies through regularly-scheduled bank

5    examinations.  Bankers need to know the rules, and they need

6    to understand how they are enforced.  The bankers are

7    concerned about this lawsuit because it appears to be a

8    significant departure from their understanding of the

9    anti-discrimination laws and regulations and the fair

10   lending examination procedures, as explained in our brief.

11         Today I want to focus on the bankers' main

12   concern, namely, that the government has filed this

13   redlining lawsuit with no facts and no evidence that the

14   bank made decisions about its market area because of race or

15   national origin.

16         Like all disparate treatment claims, there are two

17   things the government must prove in a redlining case.

18   First, the government must show a disparity.  The defense

19   has laid out the arguments as to why there isn't really a

20   disparity in this case, but the banks are really scared when

21   they see this particular complaint.

22         Like all community banks with limited resources,

23   KleinBank cannot be all things to all people.  Therefore, it

24   serves part of the Twin Cities metropolitan area and it does

25   not serve other parts of it.  Specifically, the complaint

1    notes that there are majority-minority neighborhoods outside

2    KleinBank's assessment area, leading to a disparity based on

3    race or national origin.  There are lots of banks in that

4    situation.  There are Minneapolis banks that don't serve the

5    minority neighborhoods in St. Paul; likewise, there are St.

6    Paul banks that don't serve the minority neighborhoods in

7    Minneapolis.  And that situation exists all over the

8    country.

9           We agree with the defense that it doesn't state a

10   disparity; but even if it did, pointing out that disparity

11   alone does not prove a legal discrimination.  The government

12   must also meet the redlining causation standard.  The

13   complaint must include facts and evidence that the bank made

14   decisions about its trade area because of race or national

15   origin.  While the complaint includes some inferences and

16   some conclusions, it includes no facts supporting the

17   inferences and no evidence proving the conclusions.  For

18   example, consider paragraph 16 of the complaint.  It reads,

19   quote, "KleinBank's unlawful consideration of race and

20   national origin in its business practices is evident from

21   the assessment areas that the bank established and

22   maintained pursuant to the Community Reinvestment Act, the

23   CRA," unquote.  That conclusion is wholly unsupported.

24   Unlawful consideration of race is evident from a map?  Can a

25   map prove why a bank made its decisions?  Can a map prove

1     all the factors the banks considered when making its

2     decisions?  Absolutely not.  A map may be able to show a

3     disparity, but it does not prove illegal discrimination.

4          Like nearly all disparate treatment cases,

5     redlining cases are decided based on whether the government

6     can prove that the bank made decisions based on race or

7     national origin as opposed to making its decisions based on

8     valid business reasons.  The fair lending examination

9     procedures we discussed in our brief explain -- explain the

10    two court-approved types of evidence the government can use

11    to meet that causation standard, namely, overt evidence and

12    comparative evidence.  The government's complaint did not

13    allege either of those two types of evidence.

14          In conclusion, the redlining definition includes a

15    causation standard.  If the government can survive a motion

16    to dismiss simply by stating a disparity, without needing to

17    prove why the disparity exists, the banking industry is at

18    great risk.  That result cannot stand.  It is inconsistent

19    with the plain language of the fair lending laws and

20    regulations, and it is counter to the government's own fair

21    lending examination procedures.

22          Because the government failed to properly plead

23    the facts needed to prove that the bank made decisions about

24    its trade area because of race or national origin, we urge

25    the court to rule that the complaint fails to state a claim

1     and we urge the court to grant KleinBank's motion to

2     dismiss.

3              Thank you again for this opportunity to address

4     the court.

5              THE COURT:  Okay.  Thank you.

6              Mr. Belen.

7              MR. BELEN:  Good morning, Your Honor.  I am

8     Christopher Belen.  I'm an attorney at the Department of

9     Justice in the Civil Rights Division, and I thank you for

10    the opportunity to address the court as well.

11             It's been a long time since KleinBank has been a

12    small rural community bank.  As the map that Mr. Lundquist

13    walked through, they have made choices.  They have expanded.

14    They have gotten closer and closer to the borders of

15    Minneapolis.  They have gone up around the north.  They have

16    gone to the south and even around the southeast, but not in

17    the city.  It has been a long time since they have been a

18    rural bank.  Even without lending explicitly, intentionally

19    inside the cities, they are still the fourth largest bank in

20    the metropolitan area.  This is not a small bank.

21             The choices that KleinBank made are the basis for

22    our complaint.  This is a disparate treatment claim.  We

23    allege that the bank made choices, a variety of different

24    choices, which I will walk through today, and it's those

25    choices which reflect an intentional discrimination.

1            As this court knows, we are here on a Rule

2     12(b)(6) motion.  That is very important.  And I'm going to

3     spend quite a bit of my time, Your Honor, if you don't mind,

4     talking about the proper pleading standard, talking about

5     what this court actually is deciding today, as opposed to a

6     summary judgment motion, which may be in the future, because

7     I think that is really the crux of this.

8            A lot of the things that both KleinBank and the

9     amicus representative brought forth to this court are

10    legitimate business reasons, their explanations for why a

11    bank did this or that.  They are alternative hypothetical

12    ways to look at the statistics.  That is what summary

13    judgment is for.  That is what discovery is for.

14            As Your Honor knows, the pleading standard is

15    pretty straightforward.  We need to have facts in the

16    complaint, that those taken with reasonable inferences drawn

17    therefrom give rise to a plausible claim; that if the things

18    said in our complaint are true, it is a plausible claim of

19    disparate treatment under the Fair Housing Act and Equal

20    Credit Opportunity Act.

21            The courts have said time and time again in

22    disparate treatment cases that this is still a fair notice

23    pleading standard.  It is not a, quote, "much higher

24    pleading standard," as Mr. Lundquist said.  This is fair

25    notice.  And I find it interesting that the defendant here

1    said that they do not have fair notice of the claims, but

2    yet spends their brief and spends this morning talking about

3    its defenses.  It's able to articulate its defenses for why

4    it did this or why it didn't do that, but then it claims, as

5    it must, under 12(b)(6) that it lacks fair notice.  It

6    doesn't even know what our claims are, which is the question

7    this court must answer on 12(b)(6).

8              On that same point, the bank talks about the FDIC.

9    And I will get to the estoppel argument, I will get to these

10   exhibits outside the pleadings, but first I want to pause,

11   because the reply brief that KleinBank filed here contains

12   two statements that are very important when it comes to the

13   fair notice that it has.  First, it says that it can tell

14   that the FDIC looked at -- was aware of, quote, "the same

15   facts."  That's page 4 of their reply brief.  Page 7 they

16   say they look at the FFIEC, the procedures, the guidelines

17   for investigators at regulatory agencies, and it says that

18   those same indicators, those same risk factors, are what are

19   at the, quote, "heart of the government's allegations" in

20   this case.  So it can tell when the FDIC looks at the same

21   facts or looks at the same factors that that would be

22   sufficient to perform a redlining exam or have a redlining

23   analysis; but when we have the same facts in our case, when

24   it is at the heart of our complaint, that somehow is not

25   sufficient to even give it fair notice.  That's

1     inconsistent.

2           The case law that the defendants cite in their

3     brief for what would be the proper pleading standard has

4     several flaws, mainly because a lot of the cases are summary

5     judgment cases, a lot of those cases, that is, you know,

6     *Hager*, *Gallagher*, Eighth Circuit decisions.  And that's an

7     important distinction because, as Your Honor knows, that is

8     with the benefit of evidence, that is with the benefit of

9     the burden-shifting analysis has already -- has the

10    opportunity to occur.  And that is the proper standard here,

11    *McDonnell Douglas*, Title VII case law, as Your Honor I am

12    sure is aware.  That is the same approach that is taken

13    here, that the plaintiff, the United States, must have those

14    facts that, if proven, would be a prima facie case and then

15    the defendant can come in and present its defenses.

16          Indirect evidence of discrimination is okay for a

17    redlining case.  The cases the defendant cite even say that.

18    That's *Gallagher* again.  That's *Brown v. Ameriprise* that's

19    decided by this court, *Folger* decided by this court.  It

20    does not need to be overt evidence of discrimination, does

21    not need to be a smoking-gun email, especially at the

22    pleading stage, Your Honor.

23          And I want to take issue with one thing Mr.

24    Lundquist said at the very beginning, which is that there

25    are two ways to prove discrimination.  He said disparate

1    impact and disparate treatment.  Well, actually, there are

2    three ways.  One is overt evidence, and then it's disparate

3    treatment, and then it's disparate impact.  But what the

4    defendant is doing here is condensing overt discrimination

5    and disparate treatment and acting as if disparate treatment

6    somehow has to meet that higher burden and has to have

7    that -- that smoking gun email, has to have that expressed

8    dislike.

9            I stopped counting, but Mr. Lundquist said several

10   times racial animus.  The courts have repeatedly said racial

11   animus is way beyond what is required for intentional

12   discrimination.  Intent is not a racial animus.  It is

13   making decisions, in this case, in a redlining case, that

14   deliver unequal access to residents of a neighborhood based

15   on the racial composition of that geography.  Racial animus

16   is too far.  And the fact that we are still hearing that

17   phrase I think again indicates that the pleading standard

18   the defendant wants this court to adopt is entirely

19   incorrect.

20           They also cite zoning cases, where the

21   burden-shifting framework in *McDonnell Douglas* do not apply.

22   That's *Ave. 6E*, the case they cite.

23           What the court, the Eighth Circuit and this court

24   and the Supreme Court have repeatedly rejected at the

25   12(b)(6) stage is when defendants say that we must -- the

1    plaintiff in a discrimination case must prove, we heard that

2    word several times this morning as well, we must prove in

3    our complaint the intent, that there was this decision,

4    racial animus.  That is not correct in the decisions that we

5    have cited.  Supreme Court, Eighth Circuit stand for that

6    proposition.

7         So what facts are sufficient?  The defendant

8    walked through the types of evidence, the types of factual

9    allegations that we have put in our compliant.  And it is

10   not just statistics.  It is not just the CRA assessment

11   area.  It is not just the branch locations.  It is not just

12   the marketing.  It is all of it taken together.  And when

13   they -- they go and they pick at one, they pick at the

14   other, I understand that's what they should do and that's

15   what summary judgment again would be for, but to say that we

16   do not have -- we have not given them fair notice of the

17   types of our allegations and the types of support for our

18   claim is simply not true.

19        And it is not just a statistics case, as Mr.

20   Lundquist pointed out.  This is not a disparate treatment

21   theory that we are advancing.  But the statistics support

22   and they are one element of our allegations.  And they may

23   disagree with our statistics.  They may think that they

24   could calculate it a different way.  Again, that's what, you

25   know, they will be able to do in discovery and they will be

1    able to present that and the court could agree with them

2    instead.  But to say that this whole case should be

3    dismissed because we have statistics is simply not correct.

4           Again, I come back to what they said in the reply

5    on page 4 and page 7.  They say that we have the same -- the

6    same facts as the FDIC was aware of.  Well, if that's what

7    is in our complaint, but somehow that is not sufficient for

8    redlining, but when the FDIC has those same facts, that is

9    so sufficient that it's enough to stop the attorney general

10   from exercising his independent authority, something is

11   inconsistent there.

12          We also do not base our allegations on an

13   assumption or an assertion that they must be lending to both

14   Minneapolis and St. Paul, every corner of that.  We have

15   allegations in our complaint in paragraphs 32 and 35 that

16   show the shortfalls, the racial disparities by KleinBank

17   within their CRA assessment area, the part of this area, the

18   part of the metro area that they claim that they are going

19   to serve.  They are -- they have racial disparities.  They

20   are treating majority-minority census tracks differently

21   than the majority white tracks inside their assessment area.

22   So even if this court were to say that the assessment area

23   is fine, they don't need to change it, injunctive relief in

24   that regard is not necessary or appropriate, they still

25   cannot explain those disparities.  And that is a factual

1    allegation in this complaint that, if true, would support a

2    plausible claim, even setting aside our arguments about

3    their assessment area and the fact that they have drawn a C

4    or a horseshoe, however you want to describe it, around the

5    urban areas in this metropolitan area.

6         One other thing that Mr. Lundquist points out, and

7    he said this in their briefs as well, is that, well, our

8    assessment area does have majority-minority districts,

9    census tracks.  And, clearly, there are some, as he pointed

10   out the numbers, in Hennepin County; but when that line was

11   drawn, they weren't there.  So, again, as we develop this

12   case through discovery, I think this court will see, and the

13   allegations stand on their own, but to now say that they

14   somehow get the credit for the ones that they do have in

15   their assessment area misses the point, first of all, again,

16   because they aren't serving those communities that are

17   inside their assessment area at the same level as the other

18   parts of their assessment area, as well as in comparison to

19   other lenders in the area.

20        One other case that the defendants have cited is

21   this *Hager* decision.  That is a situation where the facts

22   were so speculative and that there was no -- there were no

23   allegations at all of different treatment across the

24   protected classes, and I think the court needs to be mindful

25   that that demonstrates the difference between our complaint.

1    Our complaint does have paragraph upon paragraph of the

2    differences based on the racial composition in the

3    neighborhoods, and it shows why this is more than enough for

4    Rule 12(b)(6).

5            One other point that the defendants have raised is

6    the issue of our statistics.  And as I said at the outset,

7    you know, this is not a case where we are only relying on

8    statistics.  And that is important for the court to not only

9    understand, but recognize that the arguments that they are

10   making challenging our statistics or even the fundamental as

11   a matter of law statistical analysis alone would not be

12   sufficient.

13           The *Gallagher* decision that they cite, as well as

14   the *Ricketts* decision that is in the briefs, you know, talks

15   about that statistics alone would not be enough, except in

16   rare circumstances where it would be so stark.  That is not

17   the case here.  It is completely inapplicable here, because

18   it is not racial disparity shown in statistics alone.  There

19   are other types of evidence that we have alleged.  It is not

20   inconsistent at all, therefore, that we can cite statistics

21   that bear out what we have seen in the other aspects of our

22   complaint, the branch locations, the marketing, et cetera,

23   as well as the CRA assessment area.

24           We are not seeking in this case, I mean, just to,

25   you know, address any concern that the court has, especially

1    at this stage, Your Honor, this is not -- the court does not

2    need to decide if that as a matter of law a government

3    agency can tell a bank that you must, or tell all banks,

4    more importantly, that you -- you must be in every city.

5    That's not what we are saying.  We are not saying that, you

6    know, if they include this part or that part that then

7    everything would be fine.  That is the opposite, that is the

8    inverse of what we are saying in our complaint.  What we are

9    saying is that this map reflects the decision that they have

10   made.  And they have made decisions that have drawn a C, as

11   Mr. Lundquist says, right around the boundaries of the

12   cities.  They claim that, well, we have always been a

13   suburban bank, that's what we want to be.  You know, that

14   again is a business reason to be addressed at summary

15   judgment, but that again indicates that there were decisions

16   made about where to go and where not to go.  And as we show

17   that when you then compare it to the majority-minority

18   census tracks even within inside, even inside the CRA

19   assessment area, where they aren't lending, they aren't

20   originating the loans at the same levels, then that is where

21   all of this evidence together at least gives the inference

22   that they are making decisions based on the racial

23   composition of the neighborhoods, and that's a plausible

24   claim for redlining.

25            And I want to address the differences between fair

1    lending and redlining.  There are many different kinds of

2    fair lending issues.  Some of the documents we have seen in

3    here refer to other ones, such as loan underwriting

4    decisions, and Mr. Lundquist talks about that.  He talked

5    about it this morning about how, well, there are no

6    allegations that we actually gave different terms to people

7    of color versus white folks.  That's not in here because

8    that's not the case that we have brought.  This is a

9    redlining case.  This is a case where they have made

10   decisions to not serve geographic areas based on the racial

11   compositions.  So don't -- we don't want the court to see

12   the blurring of the lines there, because that is very

13   important when you look at what the FDIC did or didn't do

14   and the assumptions that the KleinBank wants you to draw at

15   this stage.

16            As Mr. Lundquist indicated, they have kind of

17   walked back what they have claimed the FDIC did in their

18   reply brief.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1          What we allege in our complaint, paragraph 13, is

2     that the FDIC did not conduct a redlining exam.  And they

3     may disagree with that.  I'm not sure if they even disagree

4     with that anymore.  But even if they disagree with that, at

5     a Rule 12(b)(6) stage, Your Honor, it must be accepted as

6     true.

7          To the extent they have filed extraneous exhibits,

8     to the extent that they're talking about what a different

9     federal agency did, to the extent they try to contradict our

10    factual allegation, those are matters outside the pleadings.

11    He says this morning that, no, actually, the government is

12    incorporated by reference.  That is not what we did.  We

13    said the opposite of what he is saying.  He is trying to

14    contradict.  He is trying to put documents in evidence that

15    would -- would oppose what we have said.

16          And the case law is very clear on this, even the

17    cases they cite.  *BJC Health System*, Eighth Circuit, said

18    that if it's offered, quote, "in opposition to the pleading

19    it cannot be considered."  *Kushner*, a case they cite, Eighth

20    Circuit.  The court actually declined to consider it,

21    because the documents were offered for the truth of the

22    matter, which is exactly what they are doing here, and the

23    opposing party disputed the facts and the inferences that

24    the propounding party offered them for.  *Dunnigan*.  This

25    court in 2016 said any -- the documents that are offered for

1    contradictory or supplementary purposes may not be

2    considered at the Rule 12(b)(6) stage.  Those documents,

3    Your Honor, don't even say what FDIC -- what KleinBank even

4    claims they did.

5              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  And, as a matter of law, the

8    fact that the FDIC, even if, even if, Your Honor, you assume

9    and you take for truth what the defendant here says, which,

10   of course, is not the proper thing to do at a Rule 12(b)(6)

11   stage, but even if you took it for truth, as a matter of law

12   it would not prevent the attorney general from exercising

13   his separate independent statutory authority.

14             Mr. Lundquist referred to the FDIC as the folks

15   who are experts and who are charged by law to bring fair

16   lending cases.  The same is true of the Department of

17   Justice.  And the assumptions that would have to be made,

18   the acceptance of facts, none of which are in the record,

19   Your Honor, in order to address this issue of due process,

20   of estoppel, of fairness, is not -- is premature, because we

21   would have to know what the FDIC actually looked at, the

22   type of data, what analysis did they actually conduct, what

23   did they find, what conclusions did they draw, what

24   statements were actually made, what are the full contents of

25   the statements that were made to this defendant, what did

1     the defendant do in reliance, what other information was

2     available to the defendants so that they did their own due

3     diligence, even if the FDIC told them one thing, what data

4     did they have that maybe indicated something else and was

5     that reasonable.  Those are all things that would need to be

6     established, none of which are here, none of which certainly

7     rise to the level of estopping the attorney general from

8     exercising his statutory authority.  It's a sticky legal

9     issue, this issue of estoppel, of what role, if any, the

10    FDIC's research, examination -- what, if any, it would play

11    in the de novo review this court will have to do about what

12    KleinBank did and whether it is a violation of law.

13          So, Your Honor, those are the points that I wanted

14    to address, and I will just conclude, but, of course, I'm

15    happy to answer any questions that Your Honor has.

16          You know, this case comes down to those decisions

17    that KleinBank itself made.  It made decisions to expand.

18    It made decisions to tell the government that it actually

19    was going to serve these areas around here, and the

20    allegations we have made is that they haven't done that.

21    They haven't actually served majority-minority areas inside

22    their own area.  But we also allege, as is exactly what is

23    the case in redlining, that the area that they are serving

24    wraps right around areas that are majority-minority and that

25    decision, those decisions were race-based.  And this court

1    can draw those reasonable inferences.  And the case law for

2    disparate treatment that we have cited talks about intent

3    for discrimination -- for discrimination cases can be shown

4    through --

5          THE COURT:  Is there any significance to the point

6    Mr. Lundquist made that the redline that you are drawing --

7    or you are alleging actually encompasses a political

8    subdivision as opposed to neighborhoods or areas or

9    residential --

10          MR. BELEN:  Your Honor, I think what you are

11    referring to is the whole geographies.  And there are

12    requirements, again, for CRA purposes, and then I will

13    transition to Fair Housing Act in a moment.  CRA does have

14    language that tells banks you can't draw an arbitrary line

15    through whole geographies.  Okay?  And that's what he's

16    referring to.  That's how he alleges, well, we will do that

17    for Dakota, we will do that for Anoka County, but we aren't

18    maybe going to do that for others, because they do draw a

19    line through Hennepin County.  He, you know, points out that

20    it is close to the City of Minneapolis line.  I would submit

21    from what we see it's not actually the same line and so that

22    belies his point a little bit.  But, again, if you are

23    excluding -- if you are following a whole geography to move

24    to Fair Housing Act, or even if you are following a

25    geographical line, if you are drawing that line on that

1    geographical line because you don't want to serve those

2    people across the line, that's redlining.  So it's one

3    thing -- you know, I agree with you that, sure, maybe their

4    defense will be better as we get into discovery when they

5    say, well, here's why we drew the line, not only do we have

6    business reasons, but we actually were following political

7    subdivision lines, and, you know, there was nothing else

8    there.  And then we will say, well, but why did you draw

9    that one, why didn't you include those neighborhoods that

10   were right on the other side of the line.  And for them to

11   say -- again, I hear what they are saying.  Their defense

12   is, well, that's not who we are, we have been a suburban

13   bank.  But, again, they have expanded; they are serving

14   areas right on the other side of that line.  And the why you

15   made that decision is -- this is premature.  It's not a

16   12(b)(6) issue.  That under *McDonnell Douglas* is plainly a

17   summary judgment question.  They provide their

18   nondiscriminatory legitimate business reasons, and the court

19   has to decide whether that's pretextual, whether it is -- it

20   is what they say it is.

21           And, again, Your Honor, I keep coming back to the

22   fact that even inside the line that they drew they aren't

23   serving majority-minority areas at the same level.  So it's

24   not just a CRA assessment line, which, again, for Your

25   Honor's benefit, the CRA assessment line is, as Mr.

1  Lundquist says, how are you serving the whole community.  It

2  is aimed at low and moderate income issues.  The Fair

3  Housing Act is race and national origin.  So with, for

4  example, a regulatory agency looks at CRA compliance, they

5  would not likely be looking at race, because they are

6  looking at income, they are looking at are you serving the

7  community.  So it's a little -- I mean, case law has -- you

8  know, CRA and Fair Housing Act are related.  I am not saying

9  they are not.  And here we think the way that they drew

10  their line identifying who they were going to serve and who

11  they weren't going to serve is an indicia of discrimination,

12  when that line keeps out majority-minority census tracks.

13            THE COURT:  Okay.  Thank you.

14            MR. BELEN:  Thank you, Your Honor.

15            THE COURT:  Anything else, Mr. Lundquist?

16            MR. LUNDQUIST:  I think the court has a good

17  understanding of the issues, so I'll rest.  Thank you.

18            THE COURT:  Okay.  Thank you very much.  It is

19  fascinating argument.  I will take the matter under

20  advisement and issue a ruling shortly.  Thank you.

21            (Court adjourned at 10:37 a.m., 9-22-2017.)

22     I, Renee A. Rogge, Official Court Reporter for the
   United States District Court, do hereby certify that the
23  foregoing pages are a true and accurate copy of the
   transcript originally filed on February 22, 2018,
24  incorporating redactions requested by counsel for defendant
   KleinBank.  Redactions appear as "XXXX" in the transcript.
25            Certified by:  /s/Renee A. Rogge
                             Renee A. Rogge, RMR-CRR